Case number 13-5330, Borgess Medical Center of Michigan Non-Profit Corporation and Bronson Methodist Hospital of Michigan Non-Profit Corporation Appellant v. Sylvia Mathews Burwell Secretary of the United States Department of Health and Human Services Mr. Rue for the Appellant, Ms. Heifetz for the Appellee Morning, Your Honors. Jeffrey Rue from Foley and Lardner on behalf of Appellants, Borgess Medical Center and Bronson Methodist Hospital. This case involves reimbursement sought by Borgess and Bronson associated with cost reports filed more than a decade ago. A number of things have taken place since those cost reports were filed that impact this case, perhaps the most significant of which is the Supreme Court's decision in King v. Burwell. While King did not announce any new law, it did place a renewed emphasis on a long-standing tenet of statutory interpretation, namely that a provision within a statute should be read within the entire statutory context and within the statute's purpose. As the Court stated, a fair reading of legislation demands a fair understanding of the legislative plan. Here are the statutes that govern this case, what we've called the non-hospital site statutes, have a clear purpose. Their purpose is to encourage hospitals to rotate their residents from the hospital to the non-hospital setting. Congress sought to accomplish this purpose by providing a monetary incentive for hospitals to rotate their residents through non-hospital settings. Only two limitations were imposed. First, Congress provided that only time spent by a resident on patient care activities could be counted towards the hospital's full-time equivalency count. Second, it provided that such patient care time could only be counted if the hospital incurred all or substantially all of the cost for the training program in that non-hospital setting. The Secretary of Health and Human Services has adopted two policies to apply the all or substantially all requirement, what we've called the single hospital policy and the written agreement requirement. In this case, these two regulatory policies were applied in such a way that Borges and Bronson, which collectively contributed over $100 million to non-hospital residency training in the years in question, have received zero reimbursement for the cost associated with resident training in the non-hospital setting. Is that how much is at stake in this case then? No, it's not, Your Honor. What's at stake in this case, the hospitals are not reimbursed dollar for dollar based on what they contribute. So what is the amount? It's tough to tell. What we're fighting about really is what goes into the FTE count. So they're reimbursed based on a resident's time. And so that time spent in the hospital setting, whether it can be counted or not, here none of the time that was spent out of the hospital setting has been permitted to be counted based on these two policies. Do you have a rough estimate of the amount of money at stake in this case? I believe it's over $5 million, but I can't give you a specific figure. I apologize. The circumstances resulting here where none of this time is counted is not the circumstance that Congress would have envisioned or desired when implementing these statutes. For the Secretary's policies to be upheld in this case, the court must first determine if the all or substantially all language is unambiguous. If it is, that's the end of the inquiry. Appellants acknowledge that the statutory language is not as direct as it could be, but I think this is where King comes to bear. The Supreme Court said that oftentimes the meaning or ambiguity of certain words or phrases in a statute may only become evident when placed into context. Is your argument that the Secretary doesn't have the authority under the statute to prescribe a written agreement requirement that's more specific than the statutory language? Is that your argument? Two arguments, Your Honor. Is that one of them?  So your argument is that since the statute says all or substantially all, the Secretary has no authority to issue a regulation that provides for a written agreement with something more precise than that statutory language? That the Secretary was not permitted to impose an additional limitation on the ability to receive funding. You mean no authority to define all or substantially all? That is correct. And that's because of King? I believe that – two reasons. First, I believe that King suggests that when we look at things – when things are looked at in context, that's what helps us determine whether something's ambiguous or unambiguous. In King, language that perhaps could have been found unambiguous was found ambiguous. Here, I think the reverse is true. The language on its face may appear ambiguous, but when placed into its context, when we see what's really going on here – On the written requirement, I thought part of your argument was that they satisfied the written requirement. That is also part of our – I thought that was your lead argument on the written requirement. On the single hospital policy, I thought your argument was that it would be asinine to read this to apply to one hospital but not to two. Yes, Your Honor. We believe that both policies – the Secretary – On the written agreement requirement, they – the government says, well, this wasn't specific enough and didn't satisfy the particular requirements of the regulation. And you're piecing together various things on that, but what's your best response to the government on that point? Well, I think that – two things in response to that point. The thrust of what the requirement is imposing is that there be a contractual obligation that they can – that the Secretary can easily see, not that this was just claimed in the cost report, but that there was some sort of contractual obligation that these monies had to be paid. That's been satisfied here. And that's the affiliation agreements. Right. Those are there and also in the bylaws as well, but there's several places where these hospitals were obligated to provide this financing. Now, there's not the level of specificity that the government has required. And they say that's the problem, the lack of specificity. What's your response to that? And I think that – I think that there's two problems with that. First off, I think the boat has to run both ways here. So they're trying to enforce this detailed level of specificity, but if we're going to do that, how about the regulations that talk about the reopening notices? Those require that all bases for the reopening must be specified. Well, that's a deflection. I mean, that's – what about on the specificity itself? On the specificity itself, the argument – Your point, I think, is that, well, if you say we're going to cover all the costs – That should be sufficient. That's broad and specific. Well, right. And I guess what we've cited some cases in our reply about technical violations and how those shouldn't be allowed to trump the overarching purpose here. Again, $100 million have been paid, no reimbursement for the non-hospital time. And we're talking about a circumstance where we didn't use the magic words in our agreement that the government would like, but we are obligated to pay those amounts. We did pay those amounts. That's what Congress wanted. We did exactly what Congress wanted in this case. Well, the Secretary – the Secretary disagrees with you about that. The Secretary does not believe you paid all. Right? The Secretary disagrees with that assertion. The Secretary claims, I believe, that it can't be demonstrated in the documentation what the monies were paid for. Exactly. That's the Secretary's position, that you have not demonstrated that. I believe that it's clear that the monies – that these monies were paid for medical residency. They were paid, but they were paid by multiple hospitals, right? They were paid by two hospitals. And when you look at the – in the PRRB's decision, they put forth a chart that sets forth the medical education costs versus the contributions made by the hospital, comparing those of years. It's about 90% for the years in question of all the funds that were coming in. It's a little lower than that on some of the – a couple of the years. A couple of the years. That's right. I'm giving you the aggregate. Some are much higher than 90%. Some are a little less. But this is where the funding is coming from. And, again, if we look at the purpose for what this statute is about, we're talking about the residence time here, looking at it from a residence level. And the focus from the Secretary on looking at the entire program, how much does this program cost in aggregate form, is really not what – where the focus should be. And on the – your King versus Burwell argument, I think, is interesting. And I think that's – it is true. I think that reminds us we're supposed to pay attention to context, not just text. But on text, you also have the Dictionary Act, which is 1 U.S.C. 1, which says that you read singular to include plural and plural to include singular on hospital as well here. So you have a decent argument on purpose slash context, but you don't have a terrible argument on single hospital either, just on the pure text that you throw the Dictionary Act in. I think that two things on – when we're looking at the single hospital quickly, we've made the argument about this being a retroactive rule change. And the application of that statute for years did not include or require a single hospital to cover all these costs. The first statement of that was past time. And I think this falls right into the Northeast Hospital case in that regard. And I'll just say with my remaining time here, we've also made the argument about Section 5504C of the Affordable Care Act. Other courts have looked at that and said that essentially the language is superfluous. I would urge this Court not to follow that trend. We've offered an explanation that gives meaning to all of the parts of that statute, and it should be enforced. Just a quick question. You mentioned when you were entering, Judge Kavanaugh, the notice argument. It was your argument that you didn't have adequate notice because the notice didn't cite the written agreement requirement. That's correct. But it did cite 86F4, and 86F4 contains the written agreement requirement. Several provisions, but they made it clear that what they were talking about was in the notice itself. And I believe the testimony before the PRB, it was acknowledged that they simply didn't include – they focused on the single hospital paying and not on the written agreement requirement itself. And they're hoping to sweep that all in by, you know, there's a more generalized statement. And we're saying essentially the same thing here. We have a generalized statement in our contract, and why shouldn't that be? Okay. Good morning, Your Honors. Samantha Heifetz for the Secretary. I think to just jump in where the conversation this morning has been taking place, I want to start with the fact that we're all on the same page here about congressional purpose and congressional intent. What could possibly be the purpose behind allowing reimbursement when there's one hospital but not when there are two? So here, the agency has talked about this at some length in a number of places, including in the 98 rulemaking. I want you to tell me what could possibly be a congressional purpose for reimbursing when there's one and not two? And give me some reason why that's not crazy. No, I mean, I think that this reflects the fact that we have a complex, decentralized scheme, and we're looking to make it administratively feasible. And Congress is obviously aware of the challenges that are presented in terms of administrative feasibility. Why is that a challenge? I've read that, and I just don't understand why that is that hard to figure out. Oh, there are two hospitals each, so it's a million dollars. If one hospital does it, we'll reimburse. But if two hospitals share the cost and pay $500,000 each, we're going to reimburse zero. I'm trying to figure out some logic. Right, so I think this case actually offers a good example of some of the ways in which this becomes quite challenging. Now, obviously, the written agreement requirement is also a separate argument, but a crucial one because it's meant to also further the desire for administrative feasibility. But when it comes to auditing multiple hospitals, I mean, the bottom line is that we're trying to make it as straightforward as possible because if we step back and look at the congressional context for this, prior to 1986, a hospital could only get reimbursed, could only seek payment for the time of its residence that was spent inside that hospital. Right, and then Congress said, we want to encourage residents to do training not just in the hospital so that they're better prepared to do outpatient work and the like. Right. It's always remained the case that if a hospital has individuals within its hospital, they can be reimbursed for that. But if they went to another hospital, and this remains true, they couldn't get money for another hospital. But the outpatient thing was the purpose. Absolutely. No, no, no, that's absolutely right. What I'm trying to highlight is simply that there's always been a concern about keeping things straightforward in terms of which entity is paying for what. Did anyone in Congress ever say anything like that? Well, I think the 2010 Affordable Care Act ratification recognizes that this is how. We have clear legislative history. You call that a ratification? Well, the legislative history makes very clear that Congress was fully aware of the approach that the agency was taking and decided to leave the language precisely in place prior to 2010. So there's been no confusion on the part of Congress that the interpretation of the secretary is the single hospital interpretation, and there was no effort on the part of Congress to alter that. But I just don't understand. With regard to the permanent years. I don't think I agree with you on the 2010, but I also don't think it matters for this case. That's totally right. But on the purpose, context, logic of this whole thing. Well, let me try and put it this way. Hold on, let me finish just to get it out. Because you admit in your brief, I think, that they actually could have gotten reimbursement for this, for the two hospitals, if they just structured it slightly differently. And you think that helps your position. I thought, well, that makes the nuttiness of this, my word, even more apparent, because this is all millions of dollars depend on the paperwork filing here. No, that's very helpful. And I don't see that in the statute. If I might. No, I think that's very helpful, because we don't think that this is an instance of mere magic words or mere formality on the part of the secretary in interpreting the statute. We think that this is a very reasonable interpretation of the statute to which the secretary is owed deference. And we think that the reason that it's such a reasonable interpretation of the statute is that having multiple entities paying for a program does increase complexity and does increase the likelihood of double payments, which Congress was clearly very concerned about. And the 98 rulemaking talks at some length about the difficulties of apportioning funding between multiple entities. And the importance of having a single entity. I'm sorry to interrupt. There's a total cost that we know what that is, I think. When you say for the hospitals, right, in the 98 rulemaking, the secretary is explaining that there is a problem when you're trying to apportion funds, whether between a hospital and a non-hospital, or it would be equally true between two hospitals. Now, look, I mean, some of the complexity comes in here, because Congress envisions. You're doing it now, though, right? We are taking a different approach now, but that approach still requires, and Congress said the entities that engage in cost sharing have to have a written agreement that spells out. Okay, you're getting back to the written agreement. Well, it's a different written agreement requirement. So now I'm speaking to in the 2010 ACA. In other words, even if different cost years were at issue here, if we were talking about post-2010 cost years, but the plaintiffs had the same relationship and the same approach to cost sharing that they had during these cost years, post-2010, that wouldn't satisfy Congress's statute, because there's still the desire to see things put to paper, to have things itemized and laid out to make it much more feasible for the agency and for the intermediaries to figure out what's going on. I mean, there is the potential, depending on which two hospitals, for example, decide to split the cost of a given program, they could wind up with different fiscal intermediaries. You know, there are challenges in this scheme such that we need to understand that it was perfectly reasonable, and this is what the district court held, on the part of the secretary to understand the statute in this way. The statute speaks in the singular. Can I interrupt? The statute has a – first of all, there's the Dictionary Act in the plural singular, so I'm not sure I agree necessarily in what I would call strong, you know, your textual argument. So let's say, from my perspective, that you have a gap in the statute. We're on the single hospital now. I mean, we're going to get to written agreement requirement, but on single hospital, let me say there's a gap in the statute. And I think, okay, the agency can fill the gap. So far, I think you and I would be on the same page. And then has the agency filled the gap reasonably? That's right. And in analyzing that, we figure out is it consistent with the overall purpose, et cetera, and we give a lot of deference on that. And it seems like the overall purpose here was to encourage hospitals to do the outpatient – I don't see a purpose in this statute anywhere or any statements of congressional intent about, on this provision, about efficiency or administrative efficiency trumping that singular purpose of encouraging hospitals to provide better resident training through outpatient facilities. No, Your Honor, I think, you know, as Your Honor notes, we agree about what the fundamental purpose is. We also agree that on the flip side, part of the purpose, or to that end, part of what Congress was trying to do was not just get hospitals to provide non-hospital training, but part of the equation, of course, is also making sure that the non-hospitals agree to participate in the scheme. So there is an element here that the agency understands to be part of congressional intent to make things as straightforward for the non-hospital as possible. Because if non-hospitals are concerned that they're going to be saddled with costs that they can't seek reimbursement for because the hospitals are seeking reimbursement, et cetera, et cetera, then we're not going to be able to effectuate the purpose of this statutory scheme. So it's not just administrative feasibility for the Secretary. It's also a recognition of the administrative needs of the non-hospital sites, many of which have limited resources for this kind of oversight and trying to make sure. Now, one more thing. How many hospitals are in this boat around the country? And you may not know this, but I'm curious. Is this case an example of something that's going on all over the place, or is this a one-off? Well, I'm not sure which type of boat Your Honor is asking about. There are several hundred teaching hospitals. How many hospitals around the country are losing their reimbursements that they think they're entitled to because of the single hospital policy back? I unfortunately don't have a specific answer for that. I'm only familiar with the cases that have been litigated. And so obviously there are decisions out of the Sixth Circuit and the Eighth Circuit and a number of district court decisions from this court that have upheld the written agreement requirement. So on the written agreement requirement, because that's your other totally independent argument. Absolutely. And your argument is you win even if the concern that they have about the single hospital is correct. You still win on written agreement. On that, why is it not enough to say we're going to pay all the costs? Well, let me take that in a couple parts to explain both what we think is required and also what the shortcomings here are. And if I might just step back for one half second and note, as this relates to congressional purpose and the Secretary's authority, that the other part of plaintiff's argument about congressional purpose as it relates both to the single hospital interpretation and the written agreement requirement seems to be suggestive of the idea that the Secretary has no authority to take any steps. I mean, to the extent they now assert that they're challenging the validity of the written agreement requirement, which, to be honest, we didn't understand their briefs to be doing. I don't understand that to be their argument, their at least primary argument either. I took their argument to be they satisfied the written agreement requirement. Right. So to the extent this Court has any questions, obviously I think the Secretary has full authority to establish. But assume you win on that. Now, they say they satisfied it, though, because they said in essence with the affiliation agreement that we agree to pay all the costs. So that's not what the affiliation agreement says. Let me take it as a factual matter first, and then we can return to what we think would be legally required. But the affiliation agreement says that they're going to provide sufficient financing. This case looks just like the MedStar case in the Eighth Circuit where the court rejected that type of an agreement. If you look in the financial statements that they've submitted underscore this. They make explicit that the hospitals are going to cover operating costs, capital outlays and debt, net of clinical revenues, university appropriations, money that comes in from contracts, from grants. The Kalamazoo Center has, and the financial statements reflect this, a number of sources of funding other than these two hospitals. And over time, indeed, that quantity has increased such that the shortfall, even if we're just looking at total financing for the Kalamazoo Center, if you look at what the hospitals paid versus what the cost of the Kalamazoo Center was, we have a difference of almost $10 million in certain years, right? So it ranges anywhere from $1.5 to nearly $10 million in shortfall. We're not talking about a mere pittance. And so it's important to understand that if the revenues of the center increased as they were expected to, the center was expected to become, and the financial statements make reference to this, more independent over time, if there was no financing over those other sources that was necessary to run the programs, then the hospitals would have been on the hook for $0. And the very point of the written agreement requirement of the statutory language is to create a threshold requirement. If a hospital, because as opposing counsel noted, this isn't about dollar-to-dollar reimbursement. This is about do you have your residents in a program that is the type of which Congress is saying you qualify to claim those people towards your reimbursement formula. And the threshold requirement established by Congress was that the hospital needed to incur all or substantially all of the costs of the program in that non-hospital setting. So it established that threshold. And here we have nothing in the affiliation agreements that comes anywhere close to that. We have no statements. But they did pay a large majority percentage over all those years. We have no idea, however. And they did that presumably because they were obligated to do so. We have no idea, unfortunately, from the materials in this record, how much the non-clinical programs cost, to what extent any of the money that they put in went. So you may have overall, let's say, had a 20% shortfall. But was the shortfall within the non-clinical programs 80%? Was it 75%? We have no way of knowing. And, of course, we're now talking in a way that gives them credit for the fact that they were putting their funding together. So when I suggest they've had a 20% overall shortfall, let's say, in a given year, that's both hospitals together. Obviously, looking at either hospital separately, consistent with the Secretary's interpretation of the statute, the shortfall is much greater. Neither one is coming anywhere close to covering all of the costs. How many hospitals around the country have gotten in trouble on this written agreement requirement? Again, Your Honor, I'm only familiar with the cases that have been litigated. So there are a handful of cases here in the D.C. Circuit, one in the District of Maine. There are the cases in the Sixth Circuit and in the Eighth Circuit where, in all of the cases, the written agreement requirement has been upheld. It's just shocking to me that hospitals are finding themselves in this book based on a failure to dot the I. It is surprising insofar as the hospitals around the country have lost tens or hundreds of millions of dollars, potentially because of something that if they had spent another 20 minutes drafting an additional paragraph or two, they would have. This is something that the agency has gone out of its way to make very clear. There can be no suggestion here that there's any lack of notice, because the regulations are extremely specific about what the agreement is expected to include. In the cost years that we're talking about in this case, the regulations specify that the hospital, the agreement has to be between, of course, the hospital and the non-hospital, and has to make clear that the hospital is going to incur the costs of the resident's salaries and their fringe benefits while they're training at the non-hospital, and that the hospital is going to compensate the non-hospital for the teaching activities of supervisory physicians, and has to say what that compensation is going to be. And the agency has – Can I interrupt you there? Of course. Go, Judge Brown. Well, no, I'm just trying to figure out how or if these two things work together. In other words, you've said there might have been a way for them to do it where it would be reimbursable. But at the same time, you've said if it's multiple hospitals, it's just not. It has to be a single hospital. Right. So what I'm trying to figure out is how that works. In other words, is there a way that they could have structured the agreement that would have permitted reimbursement for both hospitals? Well, let me step back and say something about what we're talking about when we speak of programs and the agreement. Because each of the non-clinical residents, each of the residency programs is a separate program. That is, we have a hematology residency program, an oncology residency program, a psychology residency program. And then for each of those programs, those are some of the programs that are at issue here where there is training going on in a non-clinical setting. And so the Kalamazoo Center is a consortium that runs both the in-hospital residency programs for these hospitals, as well as the non-clinical. So they're not just doing non-clinical stuff. They're running all the different residency programs for everyone. And the agreements that we have here, if anything, seem more directed to the in-hospital programs. They say absolutely nothing. There's no mention in any of these agreements of any non-hospital setting whatsoever. But when we say that they could have structured it differently, what we're saying is they could have entered agreements consistent with the regulations for each of their programs, ontology, hematology, et cetera, and each would have been a separate agreement or at least separate portions of perhaps an overall agreement. But they would have had to separately agree that they're going to incur the costs of the salaries and fringe benefits of the residents in that program and that they're going to cover the supervisory costs for that program. Supervisory costs obviously vary quite a lot from program to program. The way that they're calculated, the agency has provided guidance on this. Essentially, there's a number of ways to make those estimates, and estimates are permitted for this purpose of indicating what compensation is going to be permitted. But you take the salary of the person. You look at what percentage of time you anticipate because you know how the program is going to operate. Can you say we're going to agree to pay all the costs? Will that satisfy the regulations? All of the costs of what? You have to be at least saying we're going to incur all of the costs of the non-hospital clinical program that's at issue. Here we don't have that. If they say that, is that good enough? Obviously, that's not this case. That's not what the regulations require. So I don't know that that would be good enough. I mean, I think that would be a harder case. Well, why wouldn't that be good enough? Because part of what we're looking for here is to make sure that the parties understand that, again, this is against the backdrop of administrative feasibility, desiring to avoid double payments, and being concerned that non-hospitals might be left on the hook for things that the Secretary thought should be covered. So we want to make sure there's agreement between the parties about who's paying for what. You're trying to protect UKMC. UKMC field is not concerned. They've been getting paid all these years. Well, they have been getting paid in this instance, but obviously the Secretary is concerned. They were sued for breach of contract? I'm not familiar with the legal arrangements between the parties. So the idea that we're just protecting UKMC. You're protecting the fiscal of the United States. Absolutely. I'm just saying there are multiple concerns and multiple considerations here, and certainly the 98 rulemaking spends quite a lot of time explaining why the Secretary wanted to make sure that it wasn't just salaries and fringe benefits that were being covered, but the supervisory teaching activities were also. The Secretary had essentially done an analysis of data prior to the 98 rulemaking and figured out that those supervisory costs make up a very big chunk of what the real costs of running these programs are, and that the stipends and the fringe benefits are less than half of the costs. And so there was a real emphasis in these regulations on splitting out that information to make sure that it was being covered by the hospital that would be seeking or by the entity that would be seeking reimbursement. Judge Brown's question, I think, was could they have done this in a way where they would have been able. . . I think your answer to that is yes. Yes. So let me just. . . Right. I apologize that I don't think I necessarily gave you the clarity in finishing that answer that I would like to. Start the answer. If they had. . . Yes. Start. Absolutely. That would have been a better approach. So yes. Well, I'd like to hear the details. How would they do it? So each of these programs, oncology, hematology, are separate programs. So what the statute and the regulation requires is a single hospital to incur the full costs of the training program. So you could imagine a world in which one hospital agrees to pay for the psychiatry program and another hospital agrees to pay for the oncology program. And so in their respective cost reports, they're each claiming that program. Now, they may have agreements with one another. And, again, this goes to the fact that we're not trying to look into what the behind-the-scenes agreements are between the Kalamazoo Center and Borges and Bronson. What we're concerned with is how straightforward are the documents that are being put before the secretary because, as Judge Kavanaugh noted, our primary concern, of course, is protecting the public fisc. So our number one interest is these hundreds or thousands of page cost reports that go to the dozen or so intermediaries, and then they're expected to do a desk review and potentially audit. But, obviously, they can't audit every page in every instance. The money at issue here, just to note, and then I apologize for putting Judge Brown, is one part of how the GRE reimbursement is calculated, which is one part of the much larger reimbursement that the agency is doing to the hospital for all of its Medicare programs. So the written agreement requirement plays a really important role in just establishing a very quick way to be certain about who's supposed to be paying for what and to know that the parties are on the same page. And so they could have divided up the programs in that way, and it would have retained the simplicity and the ease of administration that the agency needs, is looking for. Because, otherwise, what happens is you wind up in the world that the plaintiffs want to be in, where essentially they're looking to force the agency here to engage in every instance in the kind of case-by-case, line-by-line audit that these types of regulations are intended to help avoid. Okay, so now Congress has said, we really do want more than one hospital to be able to do this. Right. So has that changed the way the hospitals would present this information to you, or would the Secretary be requiring the same kind of specificity? So the regulation has changed consistent with Congress's enactment, but the written agreement requirement remains or written agreements remain an important part of the scheme. As I noted earlier, in fact, it is now part of the statute that Congress has made clear that if two hospitals are going to split costs, they have to have a written agreement that spells out the proportional sharing that's going to be going on between those two hospitals with regard to that training program. So, again, a level of specificity. That doesn't say anything about a written agreement with a third-party entity. The statute doesn't, but that remains part of the regulations. The regulations now and since 2004 have offered hospitals options in terms of how they go about qualifying for this payment. So the written agreement remains one way that a hospital can come forward and meet the regulatory requirements. There is an alternative in the current regulations, but there's nothing in this record that would allow these plaintiffs, even if we were talking about current time years. During the cost years at issue, essentially all the way up until the near very end of the cost years at issue, the regulations didn't allow any type of alternative. Since 2004, the regulations have permitted an alternative to the written agreement. That alternative requires documentation that is not in this record. Plaintiffs have never tried to avail themselves of that alternative, and they'd only be able to do so for the last few months of 2004, I believe. But in any event, they have never suggested that they're trying to take advantage of that, and they wouldn't be able to because the alternative requires documentation that shows that the hospital specifically incurred the costs that we're talking about, salaries for benefits, supervisory physician costs, and that those were paid by the end of the third month after those costs were incurred. It requires very detailed documentation that obviously this record, just to step back, doesn't tell us anything about what the non-hospital programs cost relative to the total cost of the Kalamazoo Center. It doesn't tell us anything about whether the monies that the hospitals were providing went to the non-hospital programs or which of the non-hospital programs or where the shortfall ultimately landed. We know we have up to a $10 million, nearly $10 million shortfall at points, but we don't know who's bearing that brunt or where those funds are coming from. And this is the whole issue that animated the Sixth Circuit and Eighth Circuit's decisions, rejecting lump sum payments of this type, rejecting debt financing, which is what these affiliation agreements agreed to provide. So, you know, they, in their reply brief, refer to this as just technical noncompliance. In this argument, they've tried to write it off as a lack of magic words, but to the agency, it is much more than that. And we think it was eminently reasonable, as the district court found, for the agency to deny reimbursement on the basis of noncompliance. There is really no principle of administrative law that would suggest that the plaintiffs or court could require the agency to decline to enforce its regulations fully or that full enforcement was unreasonable. The board did. Well, here the board's decision was subject to review by the secretary. I understand that. I'm just saying the board. It's not like our argument's totally off the rails because the board agreed to it. No, I'm not suggesting that they have a frivolous argument. It's simply that ultimately it falls, and the question for the court is one of what type of deference to give to the secretary's determination and whether the secretary's determination was a reasonable one. And here we would submit that it was an eminently reasonable one that was fully supported by the record. If there are no further questions. Okay, thank you. Thank you. I'll have any time left. You can take two minutes if you'd like it. Thank you, Your Honor. Just a couple of quick points. I don't know if I'll need the whole two minutes. I think these hoops imposed by the secretary don't make sense, and I think the King allows this court not to extend deference if it chooses not to. If it decides that this is an extraordinary circumstance, such that these limitations are really going to the heart of what the statute is about, that's an opportunity for this court. Do you agree, though, that the written agreement requirement is a separate and independent basis for resolving this case? Yes, I do. Okay. And does your King argument apply to that also? I think it does. I see. I think we also don't need these hoops in this case to make these determinations, this argument that these are necessary for administrative purposes. On the written agreement requirement, the biggest argument the counsel advanced was that you didn't provide the numbers, in essence, the documentation, the facts and figures that would meet the requirement of the written agreement requirement in this case. To me, that's probably the heart of that argument and, therefore, potentially the heart of the case. So what's your response? My response to that, and I think we've noted this in our briefs, but what I think is really important is the stipulation that was entered between the hospitals and the Medicare contractor. These are the people that are doing the audits. These things get put on the cost report, and then the only way they get brought up is if the auditor is actually looking at this and saying, hey, there's an issue here. They looked at that. They agreed exactly how many FTEs. It was 4.35. This gets added to your cost report if this case is granted in the hospital's favor. They agreed. They know exactly how many residents are at issue, how much time was spent in the non-hospital setting, and that these were satisfied. So the purposes of having... But they didn't look, correct me if I'm wrong, to what the counsel was talking about, namely the agreement between the hospitals on the one hand and the third party and an entity on the other, Kalamazoo. Well, I believe they did look at the agreements there by entering the stipulation. Sorry to interrupt. They didn't look, correct me if I'm wrong, at the course of dealing, the amounts that were paid over the years, et cetera, the shortfalls that counsel referenced, right? I think they had access to the financials there, and I think they did look at that. I think that's in the record before the PRB. And I think by the stipulation, what they're acknowledging is by accepting those FTEs and saying these are what are going over, it's essentially an acknowledgment that that time was spent in non-hospital setting, it was for patient care, and that the hospital incurred the cost for that time, or they couldn't have agreed to those FTEs. Counsel, I know you have time. All this will be my last question. The counsel referred several times to the shortfall that varied several million dollars each year, and that that indicated one of the problems with your theory of this because we don't know what those shortfalls were for, and what's your response to that? Is that relevant, or is that wrong? I don't think it's particularly relevant. I think that the idea would be that perhaps resident salaries and fringe benefits were getting paid by the shortfall and not the other amount. Again, I think that if that were the case, then the person who did the audit would not have agreed to those FTEs because that's what they're looking for. So that's one point in response. Two, I think, again, I'll go back to what the PRB set forth in their chart there. About 88%, I think it was, of all the funds for actual medical training were provided by the hospitals. I think that's all or substantially all of those funds when we're looking at that. I believe later on in 2007, the secretary even said it only had to be 90% of the amount,  but I guess my question is why did the affiliation agreements, under your theory, in essence said all, and then 88% is not all? So what was going on there? Well, we're not disputing that there was some clinical revenue that was generated through these programs. They're not discounting that. This program is not making an additional profit here. But we're funding it. If we went away, the program doesn't exist, and that wouldn't fit with what Congress wants. And that's the point here. The Medicare maze is really complicated enough. We did what Congress wanted here. We paid millions of dollars. These hospitals had their residents trained in the non-hospital setting. Were you all the lawyers for the hospital back in 01 through 05? What was that, Your Honor? Were you the lawyer for the hospitals back in 01? I was not, Your Honor. Okay. Was your firm the lawyer for the hospitals back then? Yes, I believe they were for most of this time. Okay. Thank you. Thank you both. Case is submitted.
judges: Tatel, Brown, Kavanaugh